**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JACK DUBBS, individually, and as
father and next friend of Tiffani
Dubbs, a minor; FRANCISCO
AGUIRRE, individually, and as father
and next friend of Jessica Aguirre, a
minor; JOY BROWN, individually,
and as mother and next friend of Marii
Brown, a minor; KEENYA COWANS,
individually, and as mother and next
friend of Keymiya Cowans, a minor;
SHANIKA CROWLEY, individually,
and as mother and next friend of
Kwanita M. Crowley, a minor;
RAICHELLE LOFTIN, individually,
and as mother and next friend of
Quenten Loftin, a minor; ELISHA
PORTERFIELD, individually, and as
mother and next friend of LaQuante
Porterfield, a minor; DAPHINE
SUDDARTH, individually, and as
mother and next friend of Ronisha
Suddarth, a minor,

          Plaintiff-Appellants,

v.                                                    Nos. 01-5098 & 01-5177

HEAD START, INC., an Oklahoma
corporation; INDEPENDENT
SCHOOL DISTRICT, NO. 1 OF
TULSA COUNTY, OKLAHOMA;
JOHN DOE, Sued as Doe Government
Agents 1 through 5, and John Does 1
through 10; JOHN DOES 1

THROUGH 10; PEGGY DOE,

Defendants,

and

COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA,
an Oklahoma not-for-profit
corporation; TULSA CITY-COUNTY
HEALTH DEPARTMENT; KD
ENTERPRISES, INC., an Oklahoma
corporation; JACKIE STRAYHORN,
ARNP; KIM BAKER, sued as: K.
Baker, RN,

Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 99-CV-732-K(E))**

---

Steven H. Aden, The Rutherford Institute, Charlottesville, Virginia (John W. Whitehead, The Ruthersford Institute, Charlottesville, Virginia, Jack Y. Goree and Christopher Goree, Goree & Goree, P.C., Tulsa, Oklahoma, and Leah Farish, Tulsa, Oklahoma, with him on the briefs), for Plaintiffs - Appellants.

Kevin D. Jewell, Magenheim, Bateman & Helfand, P.L.L.C., Houston, Texas, Roni S. Rierson, Atkinson, Haskins, Nellis, Holeman, Phipps, Brittingham & Gladd, Tulsa, Oklahoma, Scott B. Wood, Whitten, Nelson, McGuire, Wood, Terry, Roeslius & Dittrich, Tulsa, Oklahoma, (William S. Helfand and Barbara E. Roberts, Magenheim, Bateman & Helfand, P.L.L.C., Houston, Texas; Galen L. Brittingham, Atkinson, Haskins, Nellis, Holeman, Phipps, Brittingham & Gladd, Tulsa, Oklahoma; Elizabeth A. Hart, Whitten, Nelson, McGuire, Wood, Terry, Roeslius & Dittrich, Tulsa, Oklahoma; John E. Dowdell and Christine D. Little, Norman, Wohlgemuth, Chandler, & Dowdell, Tulsa, Oklahoma, with them on the briefs) for Defendants - Appellees.

Before **SEYMOUR** and **McCONNELL** , Circuit Judges, and **KRIEGER** , District Judge. [*]

**McCONNELL** , Circuit Judge.

In this civil rights action, parents of eight pre-school children enrolled in the Head Start program in Tulsa, Oklahoma, complain that their children were subjected to intrusive physical examinations, including genital examinations and blood tests, on school premises without parental notice or consent. They claim that the Head Start agency, defendant Tulsa Community Action Project, falsely represented to medical personnel that consent forms had been obtained for each of the children and insisted on examinations even for children with up-to-date physicals supplied by their own doctors. They claim that these examinations violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution and under state law.

In a series of orders, the district court disposed of all claims against all defendants, either on dismissal for failure to state a claim on which relief may be granted or on summary judgment. The district court then ordered the plaintiffs to pay the costs of the litigation.

---

[*]The Honorable Marcia S. Krieger, United States District Judge for the District of Colorado, sitting by designation.

For the reasons set forth below, we reverse the judgment of the district court insofar as it granted summary judgment on the claims against the Tulsa Community Action Project under the Fourth Amendment, technical battery, and invasion of privacy under Oklahoma law, also reverse the dismissal of the parents' claim under the Fourteenth Amendment, but affirm as to all other claims, and remand for further proceedings, including reconsideration of the assessment of costs against the parents.

## Factual and Procedural Background

Head Start is a program designed to provide qualified low-income children with pre-elementary instruction to enable them to succeed when they enter school. Recognizing the connection between health care and educational readiness, Head Start program regulations require Head Start agencies, within 90 days of enrollment of a child in the program, in "collaboration with the parents," to "make a determination as to whether or not each child has an ongoing source of continuous, accessible health care." 45 C.F.R. 1304.20(a)(1)(i). If not, the agency must "assist the parents" in "accessing a source of care." *Id.* In addition, the agency must "[o]btain from a health care professional" a "determination as to whether the child is up-to-date on a schedule of age appropriate preventive and primary health care," in accordance with professional standards. *Id.*, §1304.20(a)(1)(ii). Again, if children are not "up-to-date" on this schedule of

care, the agency is instructed to "assist parents in making the necessary arrangements to bring the child up-to-date." *Id.*, §1304.20(a)(1)(ii)(A). The regulations do not authorize, nor do they permit, Head Start agencies to provide medical examinations or health care to enrolled children without parental knowledge or consent.

Defendant-Appellee Tulsa Community Action Project ("CAP") is a not-for-profit organization that oversees the Head Start program in Tulsa, Oklahoma. It is a "Head Start Agency" or "grantee" as defined by the applicable regulations, 45 C.F.R. § 1301.2. It receives both state and federal funds. Other defendants (and appellees) are the Tulsa City-County Health Department (the "County Health Department"), K.D. Enterprises ("KD"), and two individual nurses, Jacqueline Strayhorn, ARNP, and Kimberly Baker, RN. CAP contracted with the County Health Department to perform the examinations at issue. The Health Department employed nurses Strayhorn and Baker, who performed the examinations. CAP contracted with KD to perform the educational component of the Head Start program in Tulsa. CAP leased space at the Roosevelt Elementary School, in Tulsa, to administer the Head Start program.

On November 5, 1998, Peggy Terry, a registered nurse and a CAP employee, entered a classroom of pre-school children participating in the Head Start program at Roosevelt Elementary in Tulsa. She announced that the children

were to be taken to a another classroom in the building for physical examinations. One parent, Misti Dubbs, who was employed as an aide in the Head Start program, protested that CAP had not obtained consent for the examinations and that many of the families had already turned in physical examination reports from their own doctors. When nurse Terry insisted on examinations for all the children, Mrs. Dubbs approached a KD supervisor who in turn consulted the supervisor of employees at KD's Roosevelt site. Neither of these supervisors intervened.

CAP had previously told the County Health Department that CAP would obtain the requisite consent from parents prior to the medical examinations. Relying on that representation, the Health Department conveyed this information to nurses Strayhorn and Baker. On November 5, Strayhorn and Baker arrived at Roosevelt before the appointed time for the exams and queried the CAP Head Start representative, Peggy Terry, about whether the children's parents had completed consent forms. Strayhorn and Baker looked for consent forms in the students' file folders and found none. The nurses raised concerns about the absence of consent forms with nurse Terry, but Terry assured them that CAP had previously obtained consent and that the proper forms were on file. Strayhorn and Baker relied on that information and proceeded with the exams.

The central question in this case is whether CAP and the other defendants had a reasonable basis for believing that the parents had consented to the examinations[1]. At the time of enrollment in the Head Start program, CAP gave parents of the enrolled children three forms. It is undisputed that these are the only consent forms for medical procedures used by CAP, and that no other form of consent, oral or written, was requested or provided. Two of the forms were to be signed by the parent and returned to CAP. One of these was entitled "Parent Consent Form," and solicited parental permission for eight specified tests "if needed": tuberculosis, speech/language, dental, developmental screening, hearing, hemoglobin/HCT, vision screening, and hearing screening. The form also solicited permission for the child to appear in CAP advertising, for name and phone number to appear on a classroom roster, and for CAP to maintain, use, and release "my child's complete history" for use in "health and educational planning." The second form was entitled "Authorization For Treatment to Minors." It solicited parental consent for "diagnosis or treatment" by a "physician or dentist," as well as transportation to a medical facility "for emergency care." At the bottom of the form, parents were given the option to

---

[1] Under some circumstances, child welfare authorities are permitted to override parental refusal of consent to medical or other examinations of their children, upon judicial authorization or in emergency situations. No one contends that this was such a case.

refuse permission to transport their child "for emergency medical/dental care," and to indicate what should be done "[i]n the event of illness or injury which require emergency medical/dental treatment." Neither of the forms to be signed by parents or guardians authorized a general physical examination or a genital examination.

The third form, provided to at least some of the parents, was entitled "Child Health Record: Form 3, Screenings, Physical Examination/Assessment." This was a physical examination form to be filled in and signed by a "health care provider," with a checklist of tests and procedures to be performed. Among the items on this checklist were a blood test (hematocrit or hemoglobin) and a genital examination. Nowhere on Form 3 was there any place for parental signature, acknowledgment, or consent.

Prior to the examinations at issue, at least four of the eight plaintiff parents had arranged for physical examinations by their own physicians. These physicians filled out "Form 3," which was then submitted to CAP. Even though it received these examination forms, CAP arranged to have these children examined along with the others on November 5.

The examinations challenged in this case were conducted in an ordinary classroom, with desks used as examination tables. The examining areas were separated only by partitions, so that it was possible for other children to see or

hear portions of the examinations performed on their classmates. According to the plaintiffs, no doctor was present and the nurses were not in uniform, and the children were given no explanation regarding what was happening. The children were required to lower or remove their underclothes and were given a medical examination that included, among other things, a genital exam and blood test. The nurses used "Form 3" to record the results of the examinations. During the examinations, all of the children were subjected to genital inspections. The girls were asked to lay spread-legged on a table where the nurses inspected the girls' labia; in some cases the nurses would "palpate," or touch, the genital area when a visual inspection was not adequate. Similarly, the nurses would palpate the boys' genitals to test for the presence of testes. Blood samples were taken by the finger stick (or "hematocrit") method, which can be frightening to small children. According to the plaintiffs, some of the children were upset and confused about the event, though testimony regarding their exact words was the subject of a motion in limine pending as of the grant of summary judgement. With the exception of Misti Dubbs, who was present in her capacity as a Head Start aide, no parents or guardians were with their children during the examinations. Parents were not given prior notice, and were not informed by telephone that day regarding the examinations. According to CAP, notification letters were prepared

and available at the project site, but "[u]nfortunately" were "not distributed to the children to take home to their parents."

The nurses who administered the examinations, Strayhorn and Baker, testified that the exams were in conformity with standards for well-child examinations and were not performed for the purpose of detecting child abuse. The plaintiffs' expert similarly testified that – aside from the lack of consent and the "improper setting" – the examinations were conducted in conformity to standards for well-child examinations. Thus, there is no remaining issue in the case regarding the manner in which the examinations were conducted.

Subsequent to the examinations, eight parents, Jack Dubbs, Francisco Aguirre, Joy Brown, Keenya Cowans, Shanika Crowley, Raichelle Loftin, Elisha Porterfield, and Daphine Suddarth, filed suit in the United States District Court for the Northern District of Oklahoma, on their own behalf and on behalf of their minor children. They asserted multiple causes of action pursuant to 42 U.S.C. § 1983: unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments; lack of substantive due process by interfering with the right of privacy in violation of U.S. Constitution article IV, § 2, clause 1, and amendments I, IV, IX and XIV; and interference with the parents' liberty rights in violation of U.S. Constitution article IV, § 2, clause 1, and amendments I, IX, and XIV. Under 42 U.S.C. §§ 1985 and 1986, the parents alleged a conspiracy to deprive

them of equal protection under the law. They also asserted various state common law and constitutional claims, including: unreasonable search and seizure in violation of Oklahoma Constitution, article 2, § 30; interference with parental liberty rights under Oklahoma Constitution, article 1, §§ 1 and 2, and article 2, §§ 2 and 30; assault; battery; invasion of privacy/intrusion upon seclusion; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence; gross negligence; and medical malpractice.

CAP, the nurses, the County Health Department, and KD first moved to dismiss, arguing failure to state a claim upon which relief could be granted and, for the individual nurses, qualified immunity. The district court granted the motions to dismiss on the substantive due process claims under 42 U.S.C. § 1983 and conspiracy claims under 42 U.S.C. §§ 1985 and 1986 as to all defendants. As to the motions of individual defendants Baker and Strayhorn, the district court granted the motions to dismiss based on the nurses' assertion of qualified immunity to the § 1983 claim alleging unreasonable search and seizure. Subsequently, all defendants sought summary judgment on the remaining constitutional and state claims. The district court granted these motions in a series of orders dated May 16, 2001.

In substance, the district court concluded (1) that the defendants' conduct did not rise to the "shocks the conscience" level necessary to state a claim under

-11-

substantive due process; (2) that the examinations were a "search" for purposes of the Fourth Amendment; (3) that the search was "reasonable" under the Fourth Amendment both because it was objectively reasonable for the defendants to believe they had consent and because the examinations fell within the "special needs" exception to the Fourth Amendment; (4) that for various reasons, including consent, plaintiffs failed to make out a claim under their various state law causes of action; and (5) that the individual defendants, Strayhorn and Baker, were entitled to qualified immunity.

## Standard of Review

The district court granted motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) as to all defendants on the substantive due process claims under 42 U.S.C. § 1983 and conspiracy claims under 42 U.S.C. §§ 1985 and 1986. It also granted motions by the individual defendants Strayhorn and Baker to dismiss under Rule 12(b)(6) for alleged Fourth Amendment violations on grounds of qualified immunity. We will uphold a dismissal under Rule 12(b)(6) "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff." *Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997) (internal citations omitted), *cert. denied*, 522 U.S. 812 (1997). The legal

sufficiency of a complaint is a question of law; therefore, a Rule 12(b)(6) dismissal is reviewed *de novo*. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Id.*, *quoting Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

The district court granted summary judgment in favor of the defendants on all remaining claims. We review *de novo* the district court's grant of summary judgment. *Phelan v. Laramie County Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1246 (10th Cir. 2000), *cert. denied*, 532 U.S. 1020 (2001). Accordingly, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When we apply this standard, we examine the record and any reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *19 Solid Waste Dept. Mechs. v. City of Albuquerque*, 156 F.3d 1068, 1071 (10th Cir. 1998).

**Discussion**

## I.      Constitutional Claims

The parents contend that the physical examinations conducted on November 5, 1998, violated their constitutional rights, and those of their children, to be free from unreasonable searches under the Fourth and Fourteenth Amendments.[2] They also assert that the physical examinations violated their children's privacy rights, which are protected as a matter of "substantive due process"[3] under the Fourteenth Amendment, as well as their own substantive due process rights.

---

[2] In addition to claims brought under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments, the parents pressed claims of conspiracy to deprive them and their children of equal protection of the law and of privileges and immunities guaranteed by the Constitution. 42 U.S.C. §§ 1985, 1986. The district court dismissed for failure to state a claim, and the parents have not appealed this dismissal or briefed these issues in this Court. We therefore do not consider these claims on appeal. *See, e.g., Murrell v. Shalala,* 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (noting failure to develop argument results in denial of appellate review).

[3] Substantive due process is the rubric under which the Supreme Court has addressed unenumerated rights under the Fourteenth Amendment. *See, e.g., Washington v. Glucksberg,* 521 U.S. 702 (1997). There is some debate about whether the Privileges or Immunities Clause of that amendment is the more historically accurate ground for such rights. *See* John Hart Ely, *Democracy and Distrust* 18 (1980); Akhil R. Amar, *The Bill of Rights and the Fourteenth Amendment,* 101 Yale L.J. 1193, 1257-59 (1992); John Harrison, *Reconstructing the Privileges or Immunities Clause,* 101 YALE L.J. 1385, 1466-69 (1992); Michael W. McConnell, *The Right to Die and the Jurisprudence of Tradition,* 1997 Utah L. Rev. 665, 691-98 (1997). *But see* Robert Bork, *The Tempting of America: The Political Seduction of the Law* 36-39 (1990). As discussed below, because the Fourth Amendment provides the explicit textual source for the rights at issue in this case, this debate does not effect the resolution of the present case.

A. Due Process

The parents maintain that the physical examinations compromised: 1) their children's fundamental right to privacy by interfering with individual bodily integrity, medical decisions related to reproduction, and the right to refuse medical treatment; and 2) their own fundamental liberty interest in the care, custody and management of their children. They claim that these rights are protected under the doctrine of "substantive due process" under the Fourteenth Amendment.[4]  The district court dismissed on the ground that a substantive due process claim must be more than an ordinary tort and must shock the conscience of the court.  *See, e.g., Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998); *Abeyta By and Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1257-58 (10th Cir. 1996).  Applying that standard, the district court dismissed each substantive due process claim, finding that, as alleged, the conduct here did not rise to conscience shocking level.

---

[4]In district court, the parents also asserted a violation of their procedural due process rights, which was dismissed on motion for summary judgment. Order Granting CAP's Motion for Summary Judgment dated May 16, 2001, at 14, App. 205-06.  In their briefs as Appellants in this court, the parents do not develop this procedural due process claim.  It is therefore waived. See *Utahns for Better Transp. v. United States Dept. of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002), *citing Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) ("even issues designated for review are lost if they are not actually argued in the party's brief").

We question the district court's rationale for dismissing these claims, for two reasons. First, the district court's evaluation of the seriousness of the defendants' challenged actions was evidently affected by the court's conclusion that the parents consented to the examinations or, in the alternative, that the examinations were necessary to conform to Head Start regulations. Order Granting CAP's Motion for Summary Judgment, dated May 16, 2001, at 7-12, App. 198-203. For reasons explained below, those conclusions were erroneous as a matter of law. Second, the district court misapprehended the legal standard applicable to purported substantive due process rights that – like the right to consent to medical treatment for oneself and one's minor children – may be "objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 117 S.Ct. 2258, 2268 (1997); *Collins v. City of Harker Heights*, 503 U.S. 115 (1992); *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977). It is not implausible to think that the rights invoked here – the right to refuse a medical exam and the parent's right to control the upbringing, including the medical care, of a child – fall within this sphere of protected liberty. *See Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278 (1990) (the "principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions"); *Troxel v. Granville*, 120 S. Ct. 2054, 2060 (2000) ("the interest of

-16-

parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court"). While the "shocks the conscience" standard applies to tortious conduct challenged under the Fourteenth Amendment, *County of Sacramento v. Lewis*, 523 U.S. 833, 848-51 (1998), it does not exhaust the category of protections under the Supreme Court's substantive due process jurisprudence, or eliminate more categorical protection for "fundamental rights" as defined by the tradition and experience of the nation.

With respect to the children's claims, however, we decline to resolve these questions because the children's interests advanced under the rubric of substantive due process are more precisely addressed under the Fourth Amendment. The Supreme Court has explained:

> Because we have always been reluctant to expand the concept of substantive due process, . . . we [have] held . . . that where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

*Lewis*, 523 U.S. at 842 (citations and internal quotations omitted); *cf. Bateman v. City of West Bountiful*, 89 F.3d 704, 709 (10th Cir. 1996) (analyzing a claim under the Takings Clause rather than the Due Process or Equal Protection Clauses). The Fourth Amendment recognizes the "right of the people to be secure in their persons . . . against unreasonable searches. . . ." U.S. Const. amend. IV.

As we explain below, the physical examinations challenged here were searches for purposes of the Fourth Amendment, and the privacy interests of the children can fully be vindicated under that "explicit textual source of constitutional protection." *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also Darryl H. v. Coler*, 801 F.2d 893, 901 n.7 (7th Cir. 1986) (noting that the Fourth Amendment claim in that case involves "the same basic analysis" as a privacy claim under the Due Process Clause). Accordingly, the Fourth Amendment, and "not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Lewis*, 523 U.S. at 842.

The same cannot, however, be said of the parents' Fourteenth Amendment claim regarding their right to direct and control the medical treatment of their children. While the parents have standing to assert a Fourth Amendment claim on their children's behalf, they can assert no independent Fourth Amendment claim of their own under these facts. *Hollingsworth v. Hill*, 110 F.3d 733, 738 (10th Cir. 1997). Yet their substantive due process claim, based on alleged violation of their parental rights, is independent of their children's claim based on unlawful search.

Given the particular posture of this case, we decline to resolve the difficult questions regarding the standard to be applied to this claim because the district court gave only cursory treatment to the parents' substantive due process claims,

possibly due to its conclusions regarding consent. Moreover, the parent plaintiffs have not further developed their substantive due process claims on appeal. For these reasons, and because we determine below that a remand is necessary regarding the issue of parental consent, we reverse the district court's disposition of the parents' substantive due process claim and remand to the district court for further consideration.

We turn, then, to the Fourth Amendment claim and the issue of consent.

B.    Search and Seizure

Plaintiffs argue that the medical examinations violated the children's right to be free from unreasonable searches under the Fourth Amendment, as applicable to the states through the Fourteenth.[5] This claim raises three subsidiary questions: (1) Were the physical examinations in this case "searches" for purposes of the Fourth Amendment? (2) Did CAP and the other defendants have a reasonable basis for belief that the parents consented to the examinations? (3) Did the

---

[5]Plaintiffs asserted similar claims under Okla. Const. Art. 2, § 30, which is the state constitutional parallel to the Fourth Amendment. *See Sloan v. Sprouse*, 968 P.2d 1254, 1258 (Okla. Crim. App. 1998). The district court granted summary judgment on these state constitutional claims on the ground that the plaintiffs had not adequately briefed the issue. Nor have they done so in this Court. The claims are accordingly waived. See *Utahns for Better Transp.*, 305 F.3d at 1175, *citing Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) (deeming claims "waived under the general rule that even issues designated for review are lost if they are not actually argued in the party's brief").

examinations fall within the "special needs" exception to the requirement of consent or a warrant?

### 1. Were the physical examinations in this case "searches" for Fourth Amendment purposes?

The Fourth Amendment to the United States Constitution provides that the Government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend IV. Under our jurisprudence, "[s]earches conducted without a warrant are *per se* unreasonable under the Fourth Amendment–subject only to a few 'specifically established and well-delineated exceptions.'" *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003), *quoting Katz v. United States*, 389 U.S. 347, 357 (1967).

The defendants contend that because the exams were not conducted upon suspicion of criminal activity and the data collected were not to be used for law enforcement purposes, the examinations were not "searches" subject to Fourth Amendment requirements. Relying on *United States v. Attson*, 900 F.2d 1427, 1429-30 (9th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990), they argue that where the alleged search is "noncriminal" and "noninvestigatory," the "application of the Fourth Amendment is limited." CAP Br. 5.

The district court concluded that the defendants were not entitled to summary judgment on this issue, because there was evidence in the record

(controverted, to be sure) that discovery of child abuse was one purpose of the exams. Indeed, the district court noted, citing 10 O.S. §§ 7103, 7104, that under Oklahoma law medical professionals would be required to report any evidence of abuse encountered during such routine exams. We agree.

More fundamentally, however, the defendants' contention that the Fourth Amendment does not apply in the "noncriminal" and "noninvestigatory" context is without foundation. The Fourth Amendment protects the right of the people to be "secure in their persons" from government intrusion, whether the threat to privacy arises from a policeman or a Head Start administrator. There is no "social worker" exception to the Fourth Amendment. *See Ferguson v. City of Charleston*, 532 U.S. 67, 76 n.9 (2001) ("we have routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment even though the results were not reported to the police."); *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) ("the strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees").[6]

---

[6] To be sure, searches that have noninvestigatory, noncriminal purposes often fit within the category of "special needs," which are subject to a balancing test rather than to the more rigorous requirement of warrant or consent. The district court held that this is such a "special needs" case, a conclusion we will address below. In this section, we discuss the defendants' more far-reaching contention, that noncriminal, noninvestigatory examinations are not "searches" for Fourth Amendment purposes at all.

The defendants rely on *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990), for the proposition that because the intent in collecting the data was not for law enforcement purposes the exams were not "searches" subject to Fourth Amendment protections. In *Attson*, a man injured in an automobile accident was taken to a public hospital for emergency treatment. He gave express consent for the taking of blood for medical purposes and blood was drawn for medical purposes, after which information regarding his blood alcohol level was supplied to the police for law enforcement purposes. The Ninth Circuit ruled that the doctor had not performed a search in violation of the Fourth Amendment because the record reflected that the doctor acted solely for health purposes of the patient and acted entirely independently of a governmental intent to collect evidence for use in the defendant's prosecution. *Id.* at 1433. The case is thus distinguishable. In *Attson*, the medical procedure was consensual; the real issue was the legality of providing the results to police. Here, the plaintiffs contend that the medical examination itself was performed without consent.

Moreover, contrary to the defendants' argument, the *Attson* decision did not suggest that all "noncriminal, noninvestigatory" examinations fall outside the protection of the Fourth Amendment. The court held: "for the conduct of a governmental party to be subject to the fourth amendment, the governmental party engaging in that conduct must have acted with the intent to assist the government

in its investigatory or *administrative* purposes and not for an independent purpose." 900 F.2d at 1433 (emphasis added). Thus, even under the Ninth Circuit's interpretation, Fourth Amendment protections extend to searches conducted for "administrative" purposes. In its brief, CAP itself asserts that the exams in this case were "mandated by federal regulation" and that its policy of conducting these exams within ninety days of enrollment was to ensure that it followed these regulations. CAP Br. at 5. The nurses and the County Health Department also characterize the exams as "solely for medical evaluation required by the government." County Health Department and Nurses Br. at 14. Thus, even under the standard of *Attson*, the examinations were searches for Fourth Amendment purposes because they were to determine whether the children were in compliance with federal Head Start regulations.

Nothing in the language of the Fourth Amendment or the precedents of the Supreme Court supports the defendants' restrictive interpretation. The Amendment is expressed in passive voice ("the right of the people to be secure in their persons ... shall not be violated") without specifying or limiting the governmental actors who are to be constrained. The focus of the Amendment is thus on the security of the person, not the identity of the searcher or the purpose of the search. The Supreme Court has posed the Fourth Amendment inquiry in terms of whether the governmental conduct at issue compromises "an expectation

-23-

of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (internal quotation omitted); *see also Camara v. Municipal Court,* 387 U.S. 523, 528 (1967) ("The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."). As the Court has explained:

> Because the individual's interest in privacy and personal security suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards, . . . it would be anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.

*O'Connor*, 480 U.S. at 715 (internal quotations and citations omitted).

In accordance with this understanding of the purposes of the Amendment, the Supreme Court has held that medical examinations including a blood or urine test trigger, at a minimum, the Fourth Amendment balancing test. *See, e.g., Schmerber v. State of California*, 384 U.S. 757, 767-68 (1966) ("compelled" blood test an intrusion constituting search); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616-17 (1989) (breathalyzer exam for chemical analysis constitutes search); *Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie, County v. Earls*, 122 S.Ct. 2559, 2568-69 (2002) (urine test search triggering Fourth Amendment inquiry under special needs balancing test); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656-58 (1995) (same)*; see Yin v. State of California*, 95 F.3d 864, 874 (9th Cir. 1996), *cert. denied*, 519 U.S. 1114 (1997)

(O'Scannlain, J., concurring) ("certain aspects of the routine physical examination at issue here would implicate the requisite 'concerns about bodily integrity,'" and thus trigger protection under the Fourth Amendment). Indeed, in the Court's "special needs" cases involving medical examination procedures, the Court did not hold that the practices at issue were or were not constitutional because they were or were not searches; rather, their permissibility under the Fourth Amendment depended upon the "reasonableness" of the procedure. *See, e.g., Earls*, 122 S.Ct. at 2564 (finding school policy of urine testing a "governmental search" but "reasonable").

The defendants' argument seems to be based, at bottom, on the view that in the absence of a criminal or other investigatory purpose, medical examinations such as those conducted at CAP's Head Start program at Roosevelt Elementary are for the good of the children and should not be hamstrung by legalistic requirements like warrants or consent. We do not doubt that CAP was acting in the interest of the children, as it understood them. But the requirement of patient consent, or of parental consent in the case of minor children, serves important practical as well as dignitary concerns, even when a social welfare agency, like CAP, believes it is acting for the good of the child.

It should go without saying that adequate consent is elemental to proper medical treatment. In medical procedures involving children, ensuring the

-25-

existence of parental consent is critical, because children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care. American Academy of Pediatrics, *Informed Consent, Parental Permission, and Assent in Pediatric Practice*, 95 Pediatrics 314-17 (February, 1995).

Even beyond constitutional values of privacy, dignity, and autonomy, parental notice and consent for childhood physical examinations are of significant practical value. Because of CAP's failure to notify parents in advance of the examinations, no parents were present to provide medical histories, discuss potential issues with the health care professionals, help to explain the procedures to the children, and reassure them about the disturbing and unfamiliar aspects of the exam – which included blood-letting, which is painful, as well as visual and sometimes tactile inspection of genitals by strangers. At least half of the plaintiff children were subjected to a duplicative exam by unfamiliar health care professionals in a makeshift setting, even though they had already obtained exams from their own doctors. These practical consequences might well have been averted by more careful attention to the children's Fourth Amendment rights.

Accordingly, we agree with the district court's conclusion that the physical examinations performed by the defendants in this case constituted "searches" within the meaning of the Fourth Amendment, and thus were unconstitutional

unless they were performed with warrant or parental consent, or fall within the "special needs" exception to the warrant requirement.

### *2. Did CAP have a reasonable basis for believing that the parents gave consent for the physical examinations?*

As already noted, the central disputed issue in this case is consent. It is well established that a search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Thus, if the trier of fact concluded that the parents in this case, on behalf of their minor children, actually consented to the examinations, there would be no Fourth Amendment violation. *United States v. Rith*, 164 F.3d 1323, 1330 (10th Cir. 1999). Moreover, because the Fourth Amendment prohibits only "unreasonable" searches and seizures, the Supreme Court has held that the Amendment is satisfied when, under the circumstances, it is objectively reasonable for the official to believe that the scope of a person's consent permitted him to conduct the search. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990); *United States v. Osage,* 235 F.3d 518, 519-21 (10th Cir. 2000).

CAP maintains that "the evidence unequivocally established, and the district court correctly held, that the parents consented to the medical examinations of their children." CAP Br. 9. That is a misstatement of the district court's holding. The district court analyzed the consent forms used by CAP in

this case and found sufficient ambiguities and inconsistencies to permit a jury to

conclude that the parents had not given their consent:

> [T]he consent forms are not models of draftsmanship.  At one point in their supplemental brief, defendants assert the "Authorization for Treatment to Minors" form must be read in bifurcated fashion, the bottom half limited to emergency care and the top half not so limited.  The language of the forms is ambiguous at times.  For example, plaintiffs' expert Dr. Nelson testified that the "Authorization for Treatment to Minors" form is limited to <u>treatment,</u> as the title suggests.  However, defendants point out that, in smaller print within the body of the form, it authorizes "<u>diagnosis</u> or treatment" (emphasis added), which more clearly suggests a routine physical examination.  The forms utilized, as this litigation has brought home to CAP, could have been crafted more precisely.  *In other words, if the dispositive issue were whether Parent Plaintiffs gave a fully-informed consent to the specific procedures of genital examination and blood test, the Court would deny summary judgment based upon a genuine issue of material fact.*

Order Granting CAP's Motion for Summary Judgment, dated May 16, 2001 at 11,

App. 202 (citations omitted; emphasis added).  The district court granted

summary judgment on the theory that CAP had an "objectively reasonable, good-

faith belief in the fact of consent and the scope of that consent."  *Id.  See also id.*

at 203 ("the examinations of all of the Minor Plaintiffs in this case were

conducted with a reasonable belief that parental consent had been properly

obtained and the scope included genital examination and blood tests").  In other

words, the record did not show that the parents actually consented, but CAP had a

reasonable belief that they did.

As the Supreme Court's decisions illustrate, there can be cases of ambiguous consent; there is a difference between an individual's actual consent to a search and the reasonableness of a government official's belief that consent was given. *Rodriguez*, 497 U.S. at 183-84. But this is not one of them. In this case, consent – if it existed – took the form of signatures on forms prepared by CAP and distributed to the parents. The forms themselves indicate precisely what the parents consented to. It is a common-law rule to construe ambiguous language against the interest of the party that drafted it. *Cf. Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62-63 (stating this principle in the context of contract interpretation). If there are any ambiguities here, the drafter of the forms – CAP – is responsible. A trier of fact might well conclude that it is not reasonable to allow the drafter of a defective consent form to claim latitude to go beyond the express terms of the consent on the basis of ambiguities that are its own handiwork.

In the context of a criminal investigation, the Supreme Court has held that the "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. In the context of this case, the parallel standard of "objective reasonableness" is: what would the "typical reasonable

person" have understood by the exchange between the Head Start agency and the parents? Because it is undisputed that the only relevant "exchange" between CAP and the parents was the distribution of the "consent forms" by CAP to the parents and the return of those forms to CAP, the issue here is what the typical reasonable person would have understood by the forms. We must bear in mind that the persons for whom the forms were prepared were not sophisticated professionals, but ordinary parents of low-income children, who had no reason to suppose that they had to parse the small print for hidden meanings.

The record contains three forms distributed and used by CAP: (1) a "Form 3" provided to at least some of the parents at the time of enrollment, but not signed by the parent, to be completed by a medical professional; (2) a form entitled "Parent Consent Form" that contains consent to certain procedures such as hemoglobin/HCT tests and ear exams; and (3) a form entitled "Authorization for Treatment of Minors" that pertains to emergency procedures. CAP contends that "[o]nce CAP received these consent forms, it believed it had parental consent to perform physical examinations on its enrollees." In addition to the forms, CAP points to Head Start program regulations that, it says, require each Head Start enrollee "to receive a physical examination within ninety days of enrollment." It contends that, in light of these regulatory requirements, a Head Start grantee is reasonably entitled to interpret the consent forms signed by the parents as

encompassing consent to a general physical examination, including genital examination.[7]

None of these forms proves that the parents consented to the examinations performed here. Only Form 3 appears on its face to have anything to do with general physical examinations, and only Form 3 contains any reference to genital examinations. Form 3, however, is not an instrument for parental consent to an examination. It is a checklist for health care professionals to record medical histories and examination results. Its top portion, the medical history section, specifically says that it is to be filled out by "Head Start Staff or Health Care Provider before Physical Examination/Assessment[,]" while the bottom portion is to be completed by the "Health Care Provider During and After Physical Examination/Assessment." Nowhere on the form is there any place for parental signature.

CAP appears to acknowledge that this form was not itself a consent form, but it argues, and the district court agreed, that the form gave notice to the parents that general physical examinations would include blood tests and genital examinations. *See* Order Granting CAP's Motion for Summary Judgment, dated

---

[7] In its brief in this Court, CAP asserts (without citation to the record or briefs) that "the parents concede that they consented to the physical examinations." CAP Br. 12. We can discover no such concession. The parents "concede" that they consented to the procedures specified by the consent forms they signed, and nothing more.

May 16, 2001 at 13, App. 204 (referring to the defendants' "objectively reasonable belief that the Form 3 gave Parent Plaintiffs at least constructive notice that the medical examinations would involve the genitalia and a blood test"). The problem with this argument is that the parents did not consent to administration of general physical examinations by CAP-supplied health care professionals. "Form 3" is the form that the parents are asked to supply to their own physicians to record the results of the physical exam and to report the results to the Head Start authorities. At least four of the eight plaintiffs took this form to their own doctors, and supplied the completed form to CAP. Nothing in the language of Form 3 provides any reason to suspect that CAP would conduct physical examinations on its own authority, without further notice or consent by parents.

This understanding is confirmed by the very regulations CAP relies upon. The regulations require the Head Start agency "[i]n collaboration with the parents and as quickly as possible, but no later than 90 calendar days" after enrollment to "[m]ake a determination as to whether or not each child has an ongoing source of continuous, accessible health care," and to "[o]btain from a health care professional a determination as to whether the child is up-to-date on a schedule of age appropriate preventive and primary health care . . . ." 45 C.F.R. § 1304.20(a). As to both determinations, if the child does not have a source of ongoing health

care or is not up-to-date on an age appropriate schedule of well child care, the regulations require the Head Start agency to "assist the parents" in satisfying the requirement. *Id.* In no circumstances do the regulations authorize the Head Start agency to subject enrolled children to physical examinations without parental notice or consent. The regulations contain a section entitled "Involving parents," which explicitly requires Head Start agencies to "[c]onsult with parents immediately when child health or developmental problems are suspected or identified," to "[f]amiliarize parents with the use of and rationale for all health and developmental procedures administered through the program," and to "obtain advance parent or guardian authorization for such procedures." *Id.*, § 1304.20 (e)(1), (e)(2).

According to these regulations, the parents of Head Start children are responsible in the first instance for obtaining a physical examination and medical history and for providing a report of this to the Head Start agency. This would appear to be the function of "Form 3." If such a form is not provided, the Head Start agency must "assist the parents" in complying. It may well be reasonable for the Head Start agency to make arrangements with the County Health Department to provide free physicals on the premises of the Head Start project, but it is not reasonable to do so without notifying the parents and obtaining their

consent, nor is it reasonable to subject children who have already filed an up-to-date "Form 3" to a second examination.

Nor do the other two forms evince consent to the examinations. The "Parent Consent Form" contained in the record provides permission for the following "if needed:" "TB Test," "Speech/Language Services," "Dental Examination/Treatment," "Developmental Screenings," "Hearing Screening," "Hemoglobin/HCT," "Vision Screening," "Hearing Screening," and "Permission . . . to Collect, Maintain, Use and Release . . . Child's Complete History." Nowhere on this form is consent given to the procedures complained of here, such as genital examination.[8] While some of these procedures are typically performed as part of a well-child examination, as the record shows, most or all of them can also be performed outside the context of a physical exam. A form granting consent to certain specified procedures does not constitute consent to other procedures, or to a general physical examination.

Similarly, the form entitled "Authorization for Treatment to Minors" does not evince consent to the examination at issue here. In bold print at the top of the document, the form is entitled "Authorization for Treatment To Minors." "Treatment" is obviously not the same thing as a routine physical examination, and a parent is unlikely to understand it as such. In the middle section, the form

_____

[8] The form does, however, authorize a blood test.

-34-

authorizes CAP to transport the child "for emergency care" or "emergency dental care," allowing the parents to designate the hospital or dentist of their choice. The bottom of the form is entitled "Refusal to Grant Permission." It allows the parent to sign a statement that "I do not give permission to Tulsa County Head Start to transport my child [space for name] for emergency medical/dental care."[9] The plaintiffs' expert, an experienced pediatrician, testified that a physician would understand this form as "a form for emergency treatment," having "nothing to do with specific on-site consent for a physical examination."

As the district court noted, CAP argued that the "Authorization for Treatment to Minors" form "must be read in a bifurcated fashion, the bottom half limited to emergency care and the top half not so limited." Order of Granting CAP's Motion for Summary Judgment, dated May 16, 2001 at 11, App. 202. Focusing solely on the top half, CAP argued that although the title of the form is limited to "Treatment," "in smaller print within the body of the form, it authorized 'diagnosis or treatment' (emphasis added)." "Diagnosis," CAP says, includes examination. But consent forms for parents of children in Head Start programs should not be an exercise in obfuscation and misdirection. The question

_____

[9] One parent, Joy Brown, signed in refusal to transport her child for treatment in order that she be the person to transport in such instances. This belies CAP's assertion that "none of the parents ever withdraw [sic] their consent or to limited [sic] their consent in any manner." CAP Br. 10.

-35-

is what a "typical reasonable person" would understand from the form. A three-part form, whose top part is entitled "treatment," and whose middle and bottom parts are explicitly confined to "emergency" treatment, falls considerably short of the evidence that would be needed to establish conclusively the consensual character of these examinations. At the very least, we cannot agree with the district court's conclusion that there was no issue of material fact regarding the objective reasonableness of CAP's belief that it had consent based on these forms.

Indeed, even if we were to accept CAP's invitation to "read [the form] in a bifurcated fashion," and to focus on the "smaller print within the body of the form" instead of the bold print title at the top, we still would come to the same conclusion: the "Authorization for Treatment To Minors Form" does not grant consent for well-child physical examinations. The top portion of the form reads as follows, in full:

**Authorization For Treatment to Minors**
We, the undersigned parent(s) or legal guardian of the minor listed below:
_____ Birth date: _____

Do hereby authorize any x-ray examination, anesthetic, dental, medical or surgical diagnosis or treatment by any physician or dentist licensed by the State of Oklahoma and hospital service that may be rendered to said minor under the general, specific or special consent of the TULSA COUNTY HEAD START PROGRAM, the temporary custodian of the minor, whether such diagnosis or treatment is rendered at the office of the physician or dentist to call in any necessary consultants, in his/their discretion.

It is understood that this consent is given in advance of any specific diagnosis or treatment being required, but is given to encourage those persons who have temporary custody of the minor, and said physician or dentist to exercise his/their best judgment as to the requirements of such diagnosis or medical or dental or surgical treatment.

This consent shall remain effective during the 1998/99 school year, unless sooner revoked in writing to the Tulsa County Head Start Program.

Parent's Legal Signature _____ Date _____

Putting aside the fact that the first paragraph contains garbled syntax and evidently is missing some words, it does not grant consent for the type of examination at issue here. To begin with, the form does not mention well-child examinations or any other form of general physical exam. It refers, instead, to "diagnosis or treatment." Contrary to CAP's argument in district court, "diagnosis" does not "suggest[] a routine physical examination." The term "diagnosis" is defined as "the art or act of identifying a disease from its signs and symptoms." Webster's Third New International Dictionary 622 (1976). While a general physical examination might disclose a disease or condition that warrants a "diagnosis," the well-child examination itself is not a "diagnosis." Moreover, the form is limited to treatment or diagnosis by a "physician or dentist licensed by the State of Oklahoma." Nurses Baker and Strayhorn are neither physicians nor dentists.

In summary, because no form signed by the parents gave CAP explicit authorization to conduct general well-child examinations, including genitalia

-37-

examinations, the district court should not have held, as a matter of law, that it was objectively reasonable for CAP to believe that it had been given consent to authorize and arrange for the children to be examined. It bears emphasis that this case comes to this Court on appeal of an order granting summary judgment in favor of the defendants. The parents did not move for summary judgment and there is no need for this Court to consider whether, on this record, they would be entitled to it. We hold only that the district court correctly held that the examinations at issue were a "search" for Fourth Amendment purposes, and that the evidence in the record is at least sufficient to permit a trier of fact to conclude that the examinations were not consensual and that it was not objectively reasonable to believe that they were. Accordingly, it is necessary to consider whether these examinations were otherwise "reasonable" or fell within an exception to the warrant requirement.

### 3. Did the examinations fall within the "special needs" exception to the requirement of consent or a warrant?

Not all searches lacking warrants or consent are unconstitutional under the Fourth Amendment. The "touchstone of the Fourth Amendment is reasonableness." *Jimeno*, 500 U.S. at 250; *Vernonia*, 515 U.S. at 652; *see also California v. Acevedo*, 500 U.S. 565, 581-83 (1991) (Scalia, J., concurring); Akhil Reed Amar, *The Constitution and Criminal Procedure: First Principles* 7-19 (1997); Telford Taylor, *Two Studies in Constitutional Interpretation* 24-29

(1969).  The general rule is that a warrantless search conducted without consent is "presumptively" unconstitutional unless it fits within certain narrow exceptions to the general rule.  *Roska*, 328 F.3d at 1040.  One of those exceptions is the so-called "special needs" doctrine. *Id.* at 1241.

"Special needs" is the label attached to certain cases where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Earls*, 122 S.Ct. at 2565, *quoting Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).  In special needs cases, the Court replaces the warrant and probable cause requirement with a balancing test that looks to the nature of the privacy interest, the character of the intrusion, and the nature and immediacy of the government's interest.  *Id.* at 2565-67.  Justice Blackmun first coined the term "special needs" in his concurrence in *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985).  The Court thereafter adopted the terminology in *O'Connor*, 480 U.S. at 720, and *Griffin*, 483 U.S. at 873, concluding that "in limited circumstances, a search unsupported by either warrant or probable cause can be constitutional when 'special needs' other than the normal need for law enforcement provide sufficient justification." *Ferguson*, 532 U.S. at 76 n.7.

At this stage in development of the doctrine, the "special needs" category is defined more by a list of examples than by a determinative set of criteria.  Among the cases said by the Court to involve "special needs" are: a principal's search of

a student's purse for drugs in school; a public employer's search of an employee's desk; a probation officer's warrantless search of a probationer's home; a Federal Railroad Administration regulation requiring employees to submit to blood and urine tests after major train accidents; drug testing of United States Customs Service employees applying for positions involving drug interdiction; schools' random drug testing of athletes; and drug testing of public school students participating in extracurricular activities.[10]  The Supreme Court has not told us

---

[10]*See T.L.O.*, 469 U.S. at 341 ("[T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administration for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause...."); *O'Connor*, 480 U.S. at 725-26 ("[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigation of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances."); *Griffin*, 483 U.S. at 873-74 ("A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements."); *Skinner*, 489 U.S. at 620 ("The ... interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements.") (citations and internal quotations omitted); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 666 (1989) (permitting drug testing by Customs Service because of critical safety concerns and because results were not made available to law enforcement); *Vernonia*, 515 U.S. at 657-58 (upholding uniform policy of suspicionless searches of student athletes);  *Earls*, 122 S.Ct. at 2264 (holding that special needs "inhere in the public school context" thereby permitting drug testing of participants in extracurricular activities).

what, precisely, this set of cases has in common, but the cases seem to share at least these features: (1) an exercise of governmental authority distinct from that of mere law enforcement – such as the authority as employer, the *in loco parentis* authority of school officials, or the post-incarceration authority of probation officers; (2) lack of individualized suspicion of wrongdoing, and concomitant lack of individualized stigma based on such suspicion; and (3) an interest in preventing future harm, generally involving the health or safety of the person being searched or of other persons directly touched by that person's conduct, rather than of deterrence or punishment for past wrongdoing. It also appears significant that each of these cases involved extraction of consent through a threatened withholding of a benefit, rather than lack of consent. In *Griffin*, the convicted felon agreed to the terms of probation as a condition to release from incarceration; in *Skinner* and *Von Raab*, the employees agreed to drug testing as a condition of employment; in *Vernonia* and *Earls*, the students were forced to agree to the drug testing if they wished to participate in specified extracurricular activities.[11] This latter factor suggests that the "special needs doctrine" is a subspecies of the unconstitutional conditions doctrine. *See* Kathleen Sullivan,

---

[11] *T.L.O.* may be an exception, though it might be argued that students accept the locker searches as a condition of the benefits of a free public education. Alternatively, *T.L.O.* might better be analyzed as a holding that public school students do not have a reasonable expectation of privacy in their lockers, vis-a-vis school officials.

*Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1433-42 (1989); Richard

Epstein, *The Supreme Court, 1987 Term–Forward: Unconstitutional Conditions,*

*State Power, and the Limits of Consent,* 102 Harv. L. Rev. 4, 92-94 (1988);

Kenneth W. Simmons, *Offers, Threats, and Unconstitutional Conditions,* 26 San

Diego L. Rev. 289, 291-92 (1989).

It is not clear, therefore, that the "special needs" doctrine has any place in this case. To be sure, the Head Start agency may have been exercising a form of *in loco parentis* authority; there was no individualized suspicion of wrongdoing and hence no stigma from being singled out for a search; and the stated purpose of the examinations was to promote the health and educational readiness of the children. On the other hand, the claim in this case involves lack of consent rather than compelled consent. According to the plaintiffs, CAP simply used its power over the children to conduct the examinations. Had CAP instead required the parents to consent to an unscheduled examination, on condition of not permitting their children to enroll in the Head Start program, this case would more closely resemble a classic "special needs" case.

We need not resolve whether the "special needs" doctrine applies, however, because it is plain that, if performed without the necessary consent, the searches were unconstitutional even if we employ the "special needs" balancing test. The sole "special need" invoked by CAP, and accepted by the district court, was "the

'special need' that the physical examination of a child, 'done in order to comply with federal regulations, is an effective means of identifying physical and developmental impediments in children prior to them starting school, a goal of Head Start . . . ." Order of Granting CAP's Motion for Summary Judgment, dated May 16, 2001 at 7, App. 198 (ellipses in original). The district court found that this qualified as a "special need" because "CAP is bound to follow the Head Start regulations and those regulations require a health determination for each child. . . . [I]t is clearly impracticable to demand adherence to the traditional warrant and probable cause requirements considering the number of children dealt with by the Head Start program." *Id.*

We cannot agree with this logic. While it is certainly true that a properly conducted physical examination is "an effective means of identifying physical and developmental impediments in children," this supplies no justification for proceeding without parental notice and consent. The premise of the "special needs" doctrine is that these are cases in which compliance with ordinary Fourth Amendment requirements would be "impracticable." *Earls*, 122 S.Ct. at 2564, *quoting Griffin*, 483 U.S. at 873. There is no reason, however, to think that parental notice and consent is "impracticable" in this context. On the contrary, CAP claims to adhere to a policy of obtaining parental consent and providing advance notice to the parents so that they can be present at the examination. The

failure to do so in this case appears to be a product of sloppy draftsmanship (with respect to consent forms) and carelessness (with respect to notice), rather than to any inherent "impracticability" of compliance with ordinary Fourth Amendment norms.[12]

Nor does compliance with Head Start regulations excuse CAP's failure to obtain parental consent. On the contrary, the regulations expressly require Head Start grantees to "obtain advance parent or guardian authorization" for "all health and developmental procedures administered through the program." 45 C.F.R. § 1304.20(e)(2). Contrary to CAP's interpretation, the regulations do not require them to obtain a physical examination within 90 days of enrollment. The regulations require Head Start grantees, within 90 days of enrollment, to "make a determination" as to whether enrolled children have an "ongoing source of continuous, accessible health care" and whether they are "up-to-date on a schedule of appropriate preventive and primary health care." 45 C.F.R. § 1304.20(a)(1)(i), (ii). If the children are lacking in these respects, it is an obligation of the Head Start grantee to "assist the parents in making the necessary arrangements." *Id.*, § 1304.20(a)(1)(ii)(A). It is not the place of a Head Start

---

[12] The other possible explanation is that, contrary to CAP's protestations, the examinations were for the purpose of detecting child abuse, and that CAP deliberately obfuscated the consent forms and deliberately failed to provide notice so that parents would not interfere. That possibility would raise Fourth Amendment issues of a different order.

agency to usurp the parental role. Indeed, to schedule medical examinations without the knowledge of the parents would thwart the purpose of the regulations. Examinations performed on the children without parental participation could not reveal whether they had access to ongoing medical care or whether they were up to date on a schedule of preventive and primary health care. To make those "determinations," the agency has to communicate with the parents and with the children's regular doctors.

For these reasons, we conclude that the "special needs doctrine" would not excuse the failure to obtain parental consent for the examinations. We turn now to the defenses put forward by each of the appellees.

C. Defenses

### 1. CAP Is Not Entitled As a Matter of Law To Immunity Under the Monell Doctrine.

CAP argues that it is entitled to immunity from liability under the rule of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held that a municipality cannot be held liable under 42 U.S.C. § 1983 merely on account of the unauthorized acts of its agents. To be liable, the municipality must have had an "official municipal policy of some nature," *id*. at 691, that was the "direct cause" or "moving force" behind the constitutional violations. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-85 (1986) (finding

municipal liability even when the "policy" was evinced by a single incident).  In reliance on this line of cases, the district court held that CAP cannot be held liable for the plaintiffs' constitutional claims "assuming arguendo a violation occurred."  The district court explained:

> When the execution of a government's policy or custom deprives or violates the constitutional rights complained of by a plaintiff, the governmental entity may be responsible for the injury under §1983 [citing *Monell*]. . . .  Isolated, unprecedented incidents are insufficient to create municipal liability.  No evidence has been presented of a pattern of conduct by CAP.  A municipal policy or practice must be the "direct cause" or "moving force" behind the constitutional violation [citing *Tuttle*].  Jerome Lee, Director of CAP's Head Start program, states in his affidavit that "It is CAP's policy that all examinations be conducted with parental consent."  No evidence has been presented raising a genuine issue of material fact on this point.  Again, the Court is persuaded summary judgment is appropriate as to the constitutional claims.

Order of Granting CAP's Motion for Summary Judgment, dated May 16, 2001 at 14-15, App. 205-6 (some citations omitted).  We do not agree.

Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law,[13] caselaw from this and other circuits has extended the *Monell* doctrine to

_____

[13] As a state and federal grantee, acting for the government in carrying out a government program in accordance with government regulatons, CAP does not challenge its status as a person "acting under color of state law." *See Milo v. Cushing Mun. Hosp.*, 861 F.2d 1194, 1196-97 (10th Cir. 1988) (finding private corporation which managed hospital liable as a state actor because liability ran with delegation of authority); *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 720-23 (10th Cir. 1988) (holding that private party acting in

(continued...)

private § 1983 defendants. *Dickerson v. Leavitt Rentals*, 995 F.Supp. 1242, 1247 (D. Kan. 1998), *aff'd.* 153 F.3d 726 (10th Cir. 1998), *cert. denied*, 525 U.S. 1110 (1999); *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F2d 714, 722-23 (10th Cir. 1988); *see also Jackson v Illinois Medi-car Inc.*, 300 F.3d 760, 766 (7th Cir. 2002); *Burke v. North Dakota Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002); *Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 729 (4th Cir. 1999); *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408-09 (2d Cir. 1990). Therefore, a private actor "cannot be held liable *solely* because it employs a tortfeasor–or, in other words . . . cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

That principle, however, does not entitle CAP to summary judgment in this case, because CAP's alleged liability is direct, not vicarious. The constitutional violation alleged in this case is the performance of medical examinations on Head Start children on the basis of forms that would not be understood by a typical reasonable person as constituting parental consent. CAP drafted those forms and has defended their use, claiming that the forms were sufficient to manifest

---

[13](...continued) accordance with duties imposed by government contract, when sued solely on basis of those acts dictated by government, is implicitly subject to liability but able to raise qualified immunity defense).

consent. That certainly constitutes evidence sufficient to demonstrate that the conduct complained of was the policy and practice of CAP.[14] To be sure, as the district court pointed out, CAP officials aver that they have a policy of obtaining parental consent before arranging examinations, but the trier of fact could conclude that by "parental consent," CAP means something less than the knowing and genuine consent required by the Fourth Amendment. The plaintiffs' evidence supports the conclusion that, by arranging the examinations without consent, CAP directly violated the children's Fourth Amendment rights. The district court's grant of summary judgment on this ground is therefore reversed as to CAP, and the case is remanded for further proceedings.

### 2. Appellee KD Was Entitled to Summary Judgment Because It Did Not Participate Directly in the Examinations

The trial court granted summary judgment to KD, the entity that CAP has contracted with to provide the educational component of the Tulsa Head Start program, on the grounds that the examinations did not violate the Fourth Amendment and that KD was not a state actor. Order of Granting KD's Motion for Summary Judgment, dated May 16, 2001 at 1-2, App. 178-9. We affirm the grant of summary judgement for KD on the alternative ground that there is no

---

[14]We note, also, that evidence in the record points to similar examinations performed pursuant to the same defective consent forms at CAP's Head Start program at Wiley Post Elementary School. This is further evidence that the occurrence at Roosevelt Elementary was not an isolated incident.

evidence that KD directly participated in the challenged conduct. *See United States v. Corral*, 970 F.2d 719, 726 n. 5 (10th Cir.1992) (holding that appellate court may affirm for any reason supported by the law and record). KD was responsible for the educational component of the Head Start program. KD had no role in performance of the examinations or in arranging for notice and consent. To the extent that any KD personnel had an incidental role in facilitating the examinations, KD was entitled to rely on CAP's representations that parental consent had been obtained. Accordingly, the district court's grant of summary judgment to KD is affirmed.

### 3. The County Health Department and the Nurses Were Entitled to Summary Judgment Because They Reasonably Relied on CAP's Representation That Parental Consent Had Been Obtained

The district court also granted summary judgment to the County Health Department and to nurses Baker and Strayhorn, on the ground that it was objectively reasonable for them to believe that the parents had given consent to the examinations. As discussed above, the standard for measuring "objective reasonableness" in determining the scope of consent is what a "typical reasonable person [would] have understood by the exchange." *Jimeno*, 500 U.S. at 251 (citations omitted). Here, the record demonstrates that the County Health Department and the nurses were objectively reasonable in believing that they had been given consent to examine the children. CAP told the County Health

Department that CAP would obtain consent for the examinations before the County Health Department personnel conducted the exams. Nurses Baker and Strayhorn relied on this information. In addition, when they questioned CAP employee, Peggy Terry, about the consent forms, she told them that she had consent forms on file. Given these exchanges, it was objectively reasonable for the County Health Department and nurses Baker and Strayhorn to conclude that CAP had obtained the requisite consent for the examinations. The district court's granting of summary judgment to the County Health Department, Baker, and Strayhorn on this ground is therefore affirmed.[15]

### III.  State Common Law Claims

#### A.    Intentional Infliction of Emotional Distress

The district court granted summary judgment to all defendants on the claim for intentional infliction of emotional distress, also known in Oklahoma as the tort of outrage. *See Breeden v. League Services Corp.*, 575 P.2d 1374, 1376-77 (Okla. 1978) (discussing intentional infliction of emotional distress/outrage and

---

[15]The district court granted Baker and Strayhorn's motions to dismiss based on qualified immunity grounds. However, as explained in text, there is no need to reach the issue of qualified immunity because the nurses were objectively reasonable in believing that CAP had obtained consent. *See, e.g., United States v. Corral*, 970 F.2d 719, 726 n. 5 (10th Cir.1992) (holding in case not affirming on immunity grounds that appellate court may affirm for any reason supported by the law and record). Nor is it necessary to decide whether the County Health Department has immunity for the state law tort claims under 51 O.S. §152.1(A).

adopting standard from *Restatement (Second) of Torts* § 46). Under Oklahoma

law, a claim for intentional infliction of emotional distress requires a showing of

conduct

> so outrageous in character, and so extreme in degree, as to be beyond
> all possible bounds of decency, and to be regarded as atrocious and
> utterly intolerable in a civilized community. Generally, the case is
> one in which the recitation of the facts to an average member of the
> community would arouse his resentment against the actor, and lead
> him to exclaim, "Outrageous!"

*Frank v. Mayberry*, 985 P.2d 733, 776 (Okla. 1999) (quoting *Restatement*

*(Second) of Torts* § 46, cmt. d).

The district court granted summary judgment on this claim because, among

other things, the plaintiffs' own expert opined that the examinations did not go

beyond the reasonable bounds of standard well-child examinations. Although we

have reversed the district court's grant of summary judgment with regard to

CAP's actions under the Fourth Amendment, we agree with the district court that

there is nothing in the record to suggest that Appellees' actions rise to the level of

extreme outrageousness required for liability on a claim of intentional infliction

of emotional distress or outrage. The district court's disposition of this claim is

therefore affirmed.

B.    Negligent Infliction of Emotional Distress/Negligence.

Under Oklahoma law, the negligent act of causing emotional distress is not

an independent tort but rather arises under the more general tort of negligence.

*Lockhart v. Loosen*, 943 P.2d 1074, 1081 (Okla. 1997).  Oklahoma does not allow recovery for negligently inflicted mental distress alone.  *Richardson v. J.C. Penney Co., Inc.*, 649 P.2d 565, 566 (Okla. Ct. App. 1982).  In order to recover on such a claim, the alleged mental distress must be "connected to some manifestation of physical suffering to the plaintiff. . . ." *McMeakin v. Roofing & Sheet Metal Supply Co. of Tulsa*, 807 P.2d 288, 290 (Okla. Ct. App. 1990).  As evidence of physical injury in this case, the plaintiffs noted the lance inflicted upon the children to draw the blood and the removal of the children's clothing.  No other ongoing trauma is alleged or argued.  The district court found that imposing liability on such alleged trauma would subject medical personnel to excessive liability under the tort of negligent infliction of emotional distress/negligence.  We have found no case suggesting that such injuries are sufficient to support a negligent infliction of emotional distress claim, and we therefore agree with the district court, and affirm its decision.

    C.    <u>Assault/Battery</u>

The Amended Complaint alleged both assault and battery claims.  All defendants were granted summary judgment on these claims.  While the plaintiffs have pursued their battery claim to some extent, they have failed to brief the issue of assault.  This Court has held that "issues will be deemed waived if they are not adequately briefed" on appeal.  *Utahns for Better Transp.*, 305 F.3d at 1175,

*citing Phillips*, 956 F.2d at 954 (deeming such claims "waived under the general rule that even issues designated for review are lost if they are not actually argued in the party's brief"). Accordingly, there is no need to review the district court's decision on the assault claim on the merits. *See Murrell,* 43 F.3d at 1389 n.2.

Under Oklahoma law, in order to establish a claim of battery, a plaintiff must prove that: 1) a defendant, without consent, acted either with the intent of making a harmful or offensive contact with the plaintiff or with the intent of putting the plaintiff in apprehension of such a contact; and 2) the defendant's act resulted in a harmful or offensive contact with the plaintiff. *See* OUJI Civ. Inst. 19.6. If medical treatment is unauthorized and performed without consent, the result is a "technical battery." *Rosson v. Coburn*, 876 P.2d 731, 734 (Okla. Ct. App. 1994); *see also Scott v. Bradford*, 606 P.2d 554, 557 (Okla. 1980); *Rolater v Strain*, 137 P. 96, 97 (Okla. 1913). "A 'technical battery' occurs when a physician, in the course of treatment, exceeds the consent given by the patient." *Rosson*, 876 P.2d at 734 n.6 *quoting Black's Law Dictionary* at 153 (6th ed. 1990).

"Consent," for tort liability purposes, "is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor." *Restatement (Second) of Torts* § 892(1). "If words or conduct are reasonably understood by another to be intended as consent, they constitute

apparent consent and are as effective as consent in fact." *Id.* at § 892(2).

Consent can also be either "apparent" or found to be implied by "custom." *Id.* at cmts. c, d. "Apparent consent" is present when "the words or acts or silence and inaction [of the aggrieved party] would be understood by a reasonable person as intended to indicate consent and they are in fact so understood by the other." *Id.*, cmt. c. "In determining whether conduct would be understood by a reasonable person as indicating consent, the customs of the community are to be taken into account." *Id.*, cmt. d.

The district court found no battery present in this case because it "found no decision in which a recognized procedure performed in the standard manner in a physical examination constitutes a harmful or offensive touching. . . ." Order Granting CAP's Motion for Summary Judgment, dated May 16, 2001 at 16, App. 207. It seems that the district court came to this conclusion after considering that the plaintiffs' expert said that the exam was in conformity to well-child exams. The district court was correct in this conclusion. However, this analysis ignores the fact that under Oklahoma law a technical battery occurs when medical personnel treat patients without consent. Presumably, what makes such contact "offensive" for purposes of liability for technical battery is the fact that the procedure is performed without consent.

As discussed above, both County Health Department and nurses Strayhorn and Baker were assured by CAP that proper consent had been obtained for the examinations. Strayhorn and Baker were assured by Peggy Terry that the proper consent forms were on file. "Consent" in the legal sense is present as to these defendants because, according to undisputed evidence in this case, it is the custom of the industry to rely on assurances from other health care professionals that proper consent has been obtained. The testimony of the plaintiffs' expert, advanced as a specialist in customs of the industry, supports this conclusion. The expert was asked "can you . . . agree that if you are informed that there are signed consent forms of the parents, that under that scenario, it is reasonable to proceed?"; he replied: "Yeah. I think there's a bit of a problem when you, you know, are an outside provider of services." This testimony demonstrates that it is customary to rely on such consent. Therefore, Baker and Strayhorn committed no battery because they had legal consent by custom, thus negating a claim for technical battery. The district court's disposition of the battery claim against the nurses is therefore affirmed.

The district court granted summary judgment to CAP on the battery claim on the ground that CAP had consent to arrange the examinations and that the examinations themselves did not deviate from the industry standard of care. ORDER of Granting CAP's Motion for Summary Judgment, dated May 16, 2001

at 16-7, App. 207-8.  As discussed above, however, the plaintiffs have submitted sufficient evidence to withstand a motion for summary judgment regarding whether CAP had objectively reasonable grounds to believe that it had consent to authorize the examinations.  For the same reason, summary judgment must be reversed with respect to CAP's alleged technical battery under Oklahoma law.

### D.    Invasion of Privacy

The plaintiffs' invasion of privacy is based on a theory of intrusion upon seclusion, one of the four branches of the tort of invasion of privacy.  *See generally Restatement (Second) of Torts* §§ 652A-E (describing four branches of invasion of privacy tort); Warren & Brandeis, *The Right of Privacy*, 4 Harv. L. Rev. 193 (1980) (describing common law foundation for invasion of privacy tort); William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383 (1960) (describing four branches of privacy tort).  The Oklahoma Supreme Court has held that there are two necessary elements to an intrusion upon seclusion claim: 1) a nonconsensual intrusion, 2) which is highly offensive to a reasonable person.  *Gilmore v. Enogex, Inc.*, 878 P.2d 360, 366 (Okla. 1994).

As to the first of these elements, we have already determined that the plaintiffs have presented evidence supporting lack of consent.  As to the second, basing its conclusion on the fact that the Plaintiffs' own medical expert concluded the examinations did not deviate from the standards for a well-child examination,

the district court held that the "intrusion" in this case would not be highly offensive to a reasonable person. Order Granting CAP's motion for Summary Judgment, dated May 16, 2001 at 17, App. 208. We have found no Oklahoma precedent that leads us to conclude that what is "offensive to the reasonable person" depends upon whether the examination complied with standards for a well-child examination, rather than an evaluation of the time, place, manner, and substance of the examination. Such a determination of reasonableness is classically reserved for resolution by the trier of fact. Thus, on both of these points, we must remand for determination of possible liability as to CAP.

Because the district court found that the intrusion was consensual and not offensive as a matter of law, it did not address the further element set forth in the language of the Restatement, which Oklahoma has adopted, regarding intent. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Munley v. ISC Fin. House, Inc.*, 584 P.2d 1336, 1339-40 (Okla. 1978) (quoting *Restatement (Second) of Torts* § 652B and explicitly adopting standard). Cases from other circuits that directly address the issue of intent explain that "[a]n intrusion occurs when an actor 'believes, or is substantially certain, that he lacks the necessary legal or personal permission to

commit the intrusive act.'" *Fletcher v. Price Chopper Foods of Trumann, Inc.*,

220 F.3d 871, 876 (8th Cir. 2000) (quoting *O'Donnell v. United States*, 891 F.2d

1079, 1083 (3d Cir. 1989)). This analysis originates in an interpretation of

Pennsylvania law, but we find its analysis of Restatement sections 652B and 8A

persuasive and we believe the Oklahoma Supreme Court would as well. Thus, on

remand, CAP's intent under this standard will need to be addressed.

As discussed above, however, based on industry custom it was reasonable

for the nurses and the County Health Department to believe that they had consent

to perform the examinations. As a result, under the facts here, the nurses and the

County Health Department lacked the requisite intent as a matter of law for

liability under a theory of intrusion upon seclusion. The district court's judgment

for nurses Baker and Strayhorn and the County Health Department on the invasion

of privacy claim is therefore affirmed. The district court's disposition of this

claim as to CAP is reversed and remanded for a determination of whether the

intrusion was nonconsensual, whether CAP's actions were highly offensive to a

reasonable person, and whether CAP acted with the requisite intent, such that it

should be liable for intrusion upon seclusion.

E.    Medical Malpractice/Negligence

The trial court correctly determined that, as a general matter, medical

malpractice encompasses the breach of a duty which a physician, by virtue of his

or her relationship to the patient, owes to exercise reasonable care in treatment. Order Granting County Health Department's Motion for Summary Judgment, dated May 16, 2001, at 4, App. 190, *citing Daniels v. Gilbreath*, 668 F.2d 477, 488 (10th Cir. 1982). A physician-patient relationship is essential to a medical malpractice action. *See generally Greenberg v. Perkins*, 845 P.2d 530, 534-36 (Colo. 1993) (*en banc*) (surveying and collecting state and federal cases so holding); *cf. Johnson v. Fine*, 45 P.3d 441, 445 (Okla. Ct. App. 2002) (declining to extend malpractice actions beyond the immediate doctor-patient relationship). On appeal, the plaintiffs do not challenge the district court's dismissal of this claim as to CAP.

With regard to the conduct of the nurses in this case the existence of a physician-patient relationship is immaterial because, as the plaintiffs' own expert points out, neither Strayhorn nor Baker deviated from the requisite standard of care. The examinations conformed to standards for well-child examinations and, as discussed above, they followed customary industry practices in relying on the representations of CAP that consent for the examinations had been given. It is true that the plaintiffs' expert testified that the consent forms themselves were insufficient, but this does not change the fact that Baker, Strayhorn, and the County Health Department were acting reasonably and within the norms of

industry practice when they relied upon CAP's representations. The district court's decision regarding medical malpractice/negligence is therefore affirmed.

## IV.    Costs

In granting summary judgment in favor of the defendants below, the district court ordered the plaintiffs to pay costs. While it may sometimes be appropriate to award costs against low-income plaintiffs bringing a suit under the civil rights laws, this should be done with caution. Since we now reverse the grant of summary judgment in substantial part, that order must also be reversed and the issue of costs remanded to the district court. *See Delano v. Kitch*, 663 F.2d 990, 1001 (10th Cir. 1981); *Amarel v. Connell*, 102 F.3d 1494, 1523 (9th Cir. 1997) (citing *Farmer v. Arabian American Oil Co.*, 379 U.S. 227 (1964)).

## Conclusion

For the reasons set forth above, we affirm the trial court's dismissal or grant of summary judgment on all claims with the following exceptions. First, we reverse the trial court's grant of summary judgment to CAP on the Fourth Amendment, technical battery, and invasion of privacy claims. We also reverse the trial court's dismissal of the parents' Fourteenth Amendment claim against CAP regarding interference with their constitutional right to direct and control the medical treatment of their children. We reverse the district court's award of costs

as well, and remand the case to the district court for proceedings consistent with this decision.