**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK MANN; MELISSA MANN;
N.G.P.M., a minor-by and through
their Guardian Ad Litem, Bruce
Paul; M.N.A.M., a minor-by and
through their Guardian Ad Litem,
Bruce Paul; N.E.H.M., a minor-by
and through their Guardian Ad
Litem, Bruce Paul; M.C.G.M., a
minor-by and through their Guardian
Ad Litem, Bruce Paul,
              *Plaintiffs-Appellees/*
                 *Cross-Appellants*,

                    v.

COUNTY OF SAN DIEGO; SAN DIEGO
COUNTY HEALTH AND HUMAN
SERVICES AGENCY; POLINSKY
CHILDREN'S CENTER,
              *Defendants-Appellants/*
                 *Cross-Appellees.*

Nos. 16-56657
      16-56740

D.C. No.
3:11-cv-00708-
GPC-BGS

OPINION

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted May 15, 2018
Pasadena, California

Filed October 31, 2018

Before:  Kim McLane Wardlaw, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

---

**SUMMARY**[*]

---

**Civil Rights**

The panel affirmed in part and reversed in the part the district court's summary judgment in an action alleging that the County of San Diego acted unconstitutionally when it removed children from their family home under a suspicion of child abuse, took them to a temporary shelter, and subjected them to invasive medical examinations, including a gynecological and rectal exam, without their parents' knowledge or consent and without a court order authorizing the examinations.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the County violated the parents' Fourteenth Amendment substantive due process rights when it performed the medical examinations without notifying the parents and without obtaining either the parents' consent or judicial authorization. The panel stated that in an emergency medical situation or when there is a reasonable concern that material physical evidence might dissipate, the County may proceed with medically necessary procedures without parental notice or consent. Neither exception applied in this case. The panel held that the County's failure to provide parental notice or to obtain consent violated the parents' Fourteenth Amendment rights and the constitutional rights of other Southern California parents whose children were subjected to similar medical examinations without due process. The panel further held that the County violated the children's Fourth Amendment rights by failing to obtain a warrant or to provide these constitutional safeguards before subjecting the children to these invasive medical examinations.

## COUNSEL

David Brodie (argued) and Caitlin E. Rae, Senior Deputies; Thomas E. Montgomery, County Counsel; Office of the County, San Diego, California; for Defendants-Appellants/Cross-Appellees.

Donnie R. Cox (argued), Law Office of Donnie R. Cox, Oceanside, California; Paul W. Leehey, Law Office of Paul W. Leehey, Fallbrook, California; for Plaintiffs-Appellees/Cross-Appellants.

**OPINION**

WARDLAW, Circuit Judge:

We have long recognized the potential conflict between the state's interest in protecting children from abusive or neglectful conditions and the right of the families it seeks to protect to be free of unconstitutional intrusion into the family unit, which can have its own potentially devastating and long lasting effects. Here, San Diego County (County) social workers removed four children under the age of six from their family home under a suspicion of child abuse, took them (as was routine) to Polinsky Children's Center (Polinsky) for temporary shelter, and subjected them to invasive medical examinations, without their parents' knowledge or consent and without a court order authorizing the examinations. The family sued the County and others, alleging violations of the parents' Fourteenth Amendment and the children's Fourth Amendment rights. On cross-motions for summary judgment, the district court concluded that the County's custom and practice of performing the medical examinations without notifying parents and excluding parents from those examinations violates the parents' Fourteenth Amendment rights. The district court further concluded, however, that the Constitution did not require the County to obtain the parents' consent or a court order. The district court did not address whether the children's Fourth Amendment rights were violated by the invasive medical examination.

These cross-appeals require us to determine whether the County violates the Fourth and Fourteenth Amendments when, absent exigent circumstances or a reasonable concern that material physical evidence might dissipate, it subjects children to medical examinations without first notifying

parents and obtaining parental consent or judicial authorization for the examinations.[1]

## I.

Mark and Melissa Mann are the parents of four children: N.G.P.M., born in 2004, and N.E.H.M., M.C.G.M., and M.N.A.M., triplets born in 2006. Mark is the director of the Wesleyan Center for 21st Century Studies at Point Loma Nazarene University. Melissa is a nurse midwife at Scripps Hospital. In April 2010, two incidents led to the removal of the Manns' children, then ages 6 and 4 (the triplets), from their family home and their admission to Polinsky.

On Monday, April 6, 2010, N.E.H.M.'s preschool director called Mark Mann after observing a red mark on her lower back. Mark went to the preschool and explained that he had struck N.E.H.M. with a wooden spoon the night before in a misguided effort to calm her. The preschool director told Mark that as a mandatory reporter, she was required to report the incident to the San Diego County Health and Human Services Agency (HHSA). With Mark in the room, the director reported the incident on HHSA's child abuse hotline and indicated that Mark was cooperative. In the following days, HHSA social workers interviewed Mark, Melissa, and the children at their home. Mark and Melissa agreed to receive supportive services and each signed a voluntary safety plan, which, among other things, prohibited Mark from using physical discipline on the

---

[1] Following the district court's determination of *Monell* liability, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the parties settled all but the *Monell* claim against the County. Consequently, we consider only the claims against the County.

children and required the presence of a third party when help was needed to adequately care for the children.

During one of these visits, social workers noticed that M.N.A.M. had a bruise on his forehead. Melissa explained that M.N.A.M. had hit his head on a kitchen countertop. When the social workers asked to photograph the bruise, however, Melissa protested that it felt "manipulative," but later that day she apologized to the social workers and volunteered to take N.E.H.M and M.N.A.M. to Rady Children's Hospital for a "Suspected Child Physical Abuse and Neglect Examination." The next day, the children's examining physician concluded that N.E.H.M.'s red mark was consistent with Mark's explanation, and that M.N.A.M.'s bruise was "most likely accidental."

Despite Mark and Melissa's cooperation, the social workers decided to prepare a dependency application in order to remove the Mann children from their home. The social workers omitted exculpatory evidence from the application[2]—evidence that the district court later concluded would have rendered the application insufficient to support a protective custody warrant. Relying on the flawed application, the juvenile court issued a warrant authorizing the removal of the children on April 12, 2010, and the County removed the Mann children from their home and took them to Polinsky later that day. Upon their admission to Polinsky, the children met with a nurse who performed a

---

[2] The application excluded, for example, Mark and Melissa's agreement to take the children to Rady Children's Hospital, and Melissa's suggestion that the children be taken to a physician. It also said that Melissa had been "confrontational and hostile" and "had refused to cooperate" with the social workers.

cursory examination, checking the children's vital signs and their heads for lice, as well as made sure they had no urgent medical needs.[3]

The next day, April 13, 2010, Mark and Melissa appeared at a detention hearing at the juvenile court, where the County asked them to sign a "Consent for Treatment – Parent" form. The standardized form authorized treatment only if the treatment was "recommended by a licensed physician . . . ." The form permitted the parents to indicate whether they preferred treatment by "Private Physician" or "Other Licensed Hospital/Medical Facility." Mark Mann signed the form and indicated that, if treatment was necessary, they preferred it to be provided by the children's private physician at Scripps Health.

Meanwhile at Polinsky, while the Manns were appearing in court, a doctor, Nancy Graff, performed a ten- to fifteen-minute medical examination of each of the Mann children that included a twenty-two point assessment of general appearance, behavior, mental status, and specific parts of the body (e.g., skin, head, and eyes). The examination also included a gynecological and rectal exam, which involved a visual and tactile inspection of the children. For the gynecological exam, Dr. Graff testified that she asked the girls to "kind of drop their legs into a frog leg situation," and "separate[d] the labia and look[ed] at the hymen . . . ." Staff also administered tuberculosis tests, requiring pricks of the children's skin, and the children gave blood and urine samples for drug screening. If staff observed signs of abuse, the County required them to photograph the abuse for the

---

[3] The Manns do not challenge the constitutionality of this initial cursory examination, and this opinion addresses only the subsequent medical examinations of the children.

children's records.  No one notified Mark and Melissa that their children were examined.

Since at least November 2003, the County routinely performed this medical examination on children admitted to Polinsky after a juvenile court order authorized it to "obtain a comprehensive health assessment as recommended by the American Academy of Pediatrics (AAP), including a mental status evaluation, for a child prior to the detention hearing . . . ."[4]  The County, however, excluded from its examination practices verbal children re-admitted to Polinsky within a short period of time, reasoning that such children are able to tell County officials about any abuse they experienced between their last discharge and their readmission.

The day after the Mann children were subjected to this medical examination, they were released from Polinsky to the custody of their paternal grandmother, who resided in the family home until the dependency proceedings were resolved.  Months later, after a trial, the juvenile court dismissed the dependency petition, concluding that it was unsupported by sufficient evidence.  Mark and Melissa were never notified that their children had been examined, and did not suspect that any medical examinations had taken place until N.G.P.M. told Melissa that "two ladies at the college [Polinsky] said they needed to touch me down there," and

---

[4] The 2007 order authorizing the examinations expired in January 2011, and the parties have not included an updated court order in the record.  The Polinsky medical examination purported to follow the guidelines prescribed by the AAP for the "Health Care of Young Children in Foster Care."  The AAP guidelines instruct that "whenever possible, confirmation should be obtained from the birth parents" and "birth parents should be encouraged to be present at health care visits and to participate in health care decisions."  The County did not follow these guidelines.

demonstrated what she was required to do for the gynecological and rectal exam.

The Mann family filed suit against the County in April 2011, alleging violations of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against the social workers and the County, as well as asserting state law claims. The Manns contended that the County violated their Fourteenth Amendment rights and the children's Fourth Amendment rights by: (1) performing the medical examinations in the absence of exigency, valid parental consent, or court order specific to the child examined, and (2) failing to notify the parents of the examinations so that they may be present.

While the Manns' case was pending before the district court, the County settled a second case with a different Southern California family, not party to this suit, who had also alleged that the County's practices of conducting the Polinsky medical examinations without parental notice and outside the presence of parents violated the Constitution. *See Swartwood v. Cty. of San Diego*, 84 F. Supp. 3d 1093, 1098–104 (S.D. Cal. 2014).[5]  To settle that lawsuit, the County proposed "modifying its consent forms, including to provide notification to parents and guardians of their right to be present at the exams;" "modifying the Polinsky Children's Center's facilities and procedures to allow for parental presence at examinations upon request;" and "modifying the Agency's requests to the Juvenile Court for child-specific orders authorizing exams and treatment of children, if parents refuse to consent to the examinations." *Swartwood v. Cty. of San Diego*, No. CV 12-1665 W (BGSx), Petition For Approval of Minors' Interest in

---

[5] The Manns' motion for judicial notice is **GRANTED**.

Settlement of Action, Dkt. No. 98-1, at 6–7.  The County did not appeal the judgment in the *Swartwood* case, and the district court's final order approving the minor's compromise omitted these remedial measures.[6]  *Id.*, Dkt. Nos. 100, 101, 103.

Notwithstanding the *Swartwood* court-approved settlement, the County contested the Manns' claims.  In November 2015, the district court granted in part the County's motion for summary judgment and granted in part the Manns' cross-motion for summary judgment.  The district court determined that the County had a policy of

---

[6] Both the County and the Manns' attempts to use the *Swartwood* settlement as a procedural weapon fail.  The Manns argue that the County should be collaterally estopped from re-litigating whether the Polinsky medical examinations violate parents' constitutional rights.  We have "hesitate[d] to give preclusive effect to the previous litigation of a question of law by estoppel against a state party when no state law precedent compels that we do so," *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 689 (9th Cir. 2004), and we decline to do so here.  "Rather than risk that an important legal issue is inadequately considered" in a district court settlement, we decide the issue for the first time for our Circuit.  *Id.* at 690.

Nor does the *Swartwood* settlement render this appeal moot, as the County argues.  The County's decision to change its practice of conducting medical examinations without parental knowledge or consent falls under the "voluntary cessation" exception to the mootness doctrine.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  The County has not demonstrated that it is legally bound to continue use of its new consent forms or its new practices, and the district court order approving the *Swartwood* minor's compromise does not mention the County's proposed remedial measures.  Notably, the County has maintained throughout this litigation that it is not constitutionally bound to provide notice and consent.  Even more importantly, the Manns seek monetary relief, for which they are eligible regardless of the County's current practices.

barring parents from the Polinsky medical examinations.[7] And, although the district court concluded that the Fourteenth Amendment required the County to notify Mark and Melissa of the Polinsky medical examinations and to include them during the examinations, it also concluded that the County was not constitutionally obligated to obtain the parents' consent or a court order to conduct the examinations.

The Manns and the County then settled most of their claims and dismissed all claims against the social workers. This settlement did not include the *Monell* claim concerning the Polinsky medical examinations. The County timely appealed this claim, contending that the Fourth and Fourteenth Amendments did not require it to provide advance notice to the parents. The Manns cross-appealed, arguing that the Fourth and Fourteenth Amendments required not only advance notice to parents but also consent or a court order to conduct the examinations. Thus the issue before us is whether the County's practice of not notifying parents and not obtaining either parental consent or judicial authorization in advance of the Polinsky medical examinations violates the Fourth and Fourteenth Amendments.

## II.

The Manns contend that the Polinsky medical examinations violate their privacy rights, which are protected as a matter of substantive due process under the Fourteenth Amendment. The Mann children, through

---

[7] The County no longer disputes this point as it did before the district court.

guardian ad litem Bruce Paul, assert that the Polinsky medical examinations violate their constitutional right to be free from unreasonable searches under the Fourth Amendment.[8]   We first address the parents' Fourteenth Amendment claims and then turn to the children's Fourth Amendment claims.[9]

## A.

We conclude that the County violates parents' Fourteenth Amendment substantive due process rights when it performs the Polinsky medical examinations without notifying the parents about the examinations and without obtaining either the parents' consent or judicial authorization. *See Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).  "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* (citing *Parham v.*

---

[8] Although the Mann children are also protected by the privacy guarantees of the Fourteenth Amendment, the Supreme Court has instructed that their claims are best analyzed under the Fourth Amendment, which provides an "explicit textual source of constitutional protection" for their claims that they were subjected to an unreasonable search.  *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

[9] We note that three district courts in the Southern District of California have already found certain of the County's practices concerning the Polinsky medical examinations unconstitutional.  *See Parkes v. Cty. of San Diego*, 345 F. Supp. 2d 1071, 1091–95 (S.D. Cal. 2004) (concluding that the County's policy of failing to notify or obtain consent from the children's parents to conduct the Polinsky medical examinations violated the Fourth and Fourteenth Amendments); *Reynolds v. Cty. of San Diego*, 224 F. Supp. 3d 1034, 1062–69 (S.D. Cal. 2016) (concluding that the County's policy of excluding parents from the Polinsky medical examinations was unconstitutional); *Swartwood*, 84 F. Supp. 3d at 1116–24.

*J.R.*, 442 U.S. 584, 602 (1979), and *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999)).  In our 2000 decision in *Wallis*, we agreed with the Second Circuit that the

> Constitution assures parents that, in the absence of parental consent, [physical examinations] of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances.

*Id.* (quoting *van Emrik v. Chemung Cty. Dep't of Soc. Servs.*, 911 F.2d 863, 867 (2d Cir. 1990)).  We held that "[b]arring a reasonable concern that material physical evidence might dissipate . . . or that some urgent medical problem exists requiring immediate medical attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations." *Id.*

The County counters by attempting to distinguish *Wallis* on the ground that its holding applies only to investigatory medical examinations.  The County claims that the Polinsky medical examinations are not investigatory.  Rather, it argues, the examinations are conducted to assess the child's "mental health" and are conducted in a "light, pleasant atmosphere."  But, as the district court found, there is no dispute here that the Polinsky medical examinations are investigatory because the "physician is looking for signs of physical and sexual abuse."  Dr. Graff, who examined the Mann children and was the co-medical director of Polinsky,

testified that she and her staff "look closely for any evidence of physical abuse" and document any evidence they find. The Polinsky medical examinations are not routine pediatric exams. Notably, the County exempts verbal children from the Polinsky medical examinations under certain circumstances because they can adequately describe potential abuse, irrespective of their immediate medical needs. That these examinations may serve dual purposes does not negate the investigatory character of the procedures.

The County's attempts to parse a purely non-investigatory purpose out of the Polinsky medical examinations are not persuasive, especially because medical examinations of young children are particularly likely to have dual purposes as the "investigation of [] abuse for child protection purposes may uncover evidence of a crime." *Greene v. Camreta*, 588 F.3d 1011, 1026–27, 1029 (9th Cir. 2009), *vacated in part as moot* 661 F.3d 1201 (9th Cir. 2011). As we observed in *Greene*, "'disentangling [the goal of protecting a child's welfare] from general law enforcement purposes' becomes particularly 'difficult,'" *id.* at 1026 (citation omitted), because California law requires mandatory reporters such as medical professionals to notify law enforcement agencies if they identify signs of child abuse. Cal. Penal Code § 11165.7; *see Greene*, 588 F.3d at 1028; *accord Roe v. Texas Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 406–07 (5th Cir. 2002) (holding that social workers' investigations regarding alleged child abuse are not "divorced from the State's general interest in law enforcement" because they function "as a tool both for gathering evidence for criminal convictions and for protecting the welfare of the child"). Because of these legal obligations, a child's medical examination may turn investigatory even if the examination does not begin as such.

We conclude that the same rules apply to purely investigatory examinations as to dual-purpose examinations, where one of the purposes is investigatory. Thus under *Wallis*, the County is required to notify the parents and obtain parental consent (or a court order) in advance of performing the Polinsky medical examinations, and permit parents to be present for these examinations because, while the examinations may have a health objective, they are also investigatory. Parental notice and consent is even more warranted when examinations have dual purposes than when the purpose is purely for health reasons. Ironically, the AAP guidelines that the County uses to justify its practices state that "[w]hen appropriate and as a part of the care plan of the child welfare agency, birth parents should be encouraged to be present at health care visits and to participate in health care decisions." Am. Academy of Pediatrics, *Health Care of Young Children in Foster Care*, 109 Pediatrics 536, 538 (2002). And we agree with the Tenth Circuit's observation that "parental consent is critical" in medical procedures involving children "because children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir. 2003) (citing Am. Academy of Pediatrics, *Informed Consent, Parental Permission, and Assent in Pediatric Practice*, 95 Pediatrics 314–17 (Feb. 1995)); *see also id.* ("It should go without saying that adequate consent is elemental to proper medical treatment.").

The district court erred by concluding that the Polinsky medical examinations were investigatory in nature but holding that parental consent was not required because the procedures were not as invasive as those used in *Wallis*. *See Wallis*, 202 F.3d at 1135 (concerning medical procedures performed on children including internal body cavity

examinations of the vagina and rectum).   The court's analysis should have stopped with its determination that the medical examinations had an investigatory purpose.   A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably protests the examinations.   "Nothing in *Wallis* or *Greene* suggests that the Fourteenth Amendment liberty interest only applies when a magnifying scope is used." *Swartwood*, 84 F. Supp. 3d at 1118.  The amount of trauma associated with a medical examination, particularly for young children, is difficult to quantify and depends upon the child's developmental level, previous trauma exposure, and available supportive resources, among other factors.[10] Given this reality, a parent's right to notice and consent is an essential protection for the child and the parent, no matter what procedures are used.

Where parental notice and consent are not possible, the law admits of recognized exceptions to parental rights.  In an emergency medical situation, the County may proceed with medically necessary procedures without parental notice or consent to protect the child's health. *See Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012) ("[P]arents have a 'constitutionally protected right to the care and custody of their children' and cannot be 'summarily deprived of that

---

[10] *See* 2008 Presidential Task Force on Posttraumatic Stress Disorder and Trauma in Children and Adolescents, *Children & Trauma*, AM. PSYCHOLOGICAL ASS'N, (2008), http://www.apa.org/pi/families/re sources/children-trauma-update.aspx. *But see also Wallis*, 202 F.3d at 1142 n.13 (citing R. Lazebnik et al., *Preparing Sexually Abused Girls for Genital Evaluation*, 13 ISSUES IN COMPREHENSIVE PEDIATRIC NURSING 155 (1990) (concluding that vaginal examinations may be particularly traumatic for young girls when their parents are not present)).

custody without notice and a hearing,' except where 'the children are in imminent danger.'") (quoting *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997)).  And when there is a "reasonable concern that material physical evidence might dissipate," notice and consent may not be required.  *See Wallis*, 202 F.3d at 1141.  But neither exception applies here. The County routinely performed the Polinsky medical examinations after a child's admission to the facility, irrespective of any medical emergency or need to preserve evidence.  And here, the County had already photographed N.E.H.M.'s red mark and M.N.A.M.'s bruise before their admission to Polinsky, and identified no other evidence it needed to collect to support its stated basis for the dependency charge.

There is no indication that providing constitutionally adequate procedures poses an administrative inconvenience. Here, had the County wished to notify Mark and Melissa of the examinations and obtain their consent, it could have easily done so when they appeared in juvenile court and signed the form that provided parental consent to future, medically necessary treatments.[11]  And the County's consent form adopted in response to the *Swartwood* litigation provides parental notice, belying any suggestion that a notice process would be administratively infeasible.  Should a parent refuse to consent, the County may obtain judicial authorization for the examination.  Because judicial supervision is almost always required to take a child into

---

[11] The County no longer argues that the "Consent for Treatment – Parent" form that Mark and Melissa signed supplies valid consent or notice, as it clearly does not.  Because that form does not explain that Polinsky staff intended to perform (and had likely already performed) a medical examination of their children and instead asked for consent for "medical, developmental, dental, and medical health care *to be given*," the form did not adequately apprise Mark and Melissa of the contemplated procedure.

protective custody, the County will invariably have a set time and place to request such judicial approval for the medical examination.

Nor is the requirement that the County provide parental notice and obtain consent inconsistent with the County's obligation to provide routine or emergency medical care to children in its custody, or with the 2003 juvenile court order that specifically authorized the medical examinations. *Accord Sangraal v. City & Cty. of San Francisco*, No. C 11-04884 LB, 2013 WL 3187384, at *14 (N.D. Cal. June 21, 2013). California law requires County social workers to "notify the parent, guardian, or person standing *in loco parentis* of the person, if any, of the care found to be needed before that care is provided" and permits the County to provide the care "only upon order of the court in the exercise of its discretion." Cal. Welf. & Inst. Code § 369(a). And in most circumstances, the County may notify the parents, obtain their consent, *and* perform the scheduled medical examinations without interference, as this case illustrates.

We reject the County's argument that we must also apply a "shocks the conscience" standard to Mark and Melissa's Fourteenth Amendment substantive due process claim under *Monell*. Neither *Wallis* nor *Greene* applied such a test, and the County cites no Ninth Circuit authority for the proposition that this test applies here. As the district court correctly concluded, Mark and Melissa have a "direct" *Monell* claim based on the County's undisputed policy or practice of failing to notify parents of the Polinsky medical examinations, for which they are only required to prove that the County acted with "the state of mind required to prove the underlying violation." *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1185–86 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th

Cir. 2016) (distinguishing "direct" from "indirect" *Monell* claims, which allege that a municipality violated the constitution through its omissions and which require a showing of deliberate indifference). The County's deliberate adoption of its policy or practice "establishes that the municipality acted culpably." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404–5 (1997) ("Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving the[] issues of fault and causation are straightforward."). Our inquiry ends there.

For all these reasons, the County's failure to provide parental notice or to obtain consent violated Mark and Melissa Mann's Fourteenth Amendment rights and the constitutional rights of other Southern California parents whose children were subjected to the Polinsky medical examinations without due process.

## B.

The Mann children possess a Fourth Amendment right to "be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV; *see also Wallis*, 202 F.3d at 1137 n.8. Because we have concluded that the Polinsky medical examinations are at least partially investigatory, the examinations are well within the ambit of the Fourth Amendment. *See Ferguson v. City of Charleston*, 532 U.S. 67, 76 n.9 (2001) ("[W]e have routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment even though the results were not reported to the police."); *see also United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990) (recognizing that the Fourth Amendment includes searches that are "somehow designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative

capacity"), *cert. denied*, 498 U.S. 961 (1990); *accord Dubbs*, 336 F.3d at 1206 (collecting cases). Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment—subject only to a few "specifically established and well-delineated exceptions." *See Katz v. United States*, 389 U.S. 347, 357 (1967).**[12]**

The County contends that the "special needs" exception to the warrant requirement applies because the Polinsky medical examinations have at least a secondary purpose of safeguarding the health of the child and other children at Polinsky. "Special needs" cases are cases in which "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *See Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 829 (2002) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). Where the special needs exception applies, we replace the warrant and probable cause requirement with a balancing test that looks to "the nature of the privacy interest," "the character of the intrusion," and "the nature and immediacy of the government's interest." *Id.* at 830–38.

---

**[12]** The Mann children's Fourth Amendment claims are not rendered moot because they are no longer in the custody and control of the County or Polinsky's staff. *See Camreta v. Greene*, 563 U.S. 692, 710–11 (2011), *vacating in part* 588 F.3d 1011 (9th Cir. 2009). Because the Mann children are still minors living in San Diego County, they remain subject to the possible jurisdiction of the County's child welfare system, and therefore it is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968).

We assume, without deciding, that the "special needs" doctrine applies to the Polinsky medical examinations,[13] but conclude that the searches are unconstitutional under the "special needs" balancing test if performed without the necessary notice and consent.  To reach this conclusion, we balance the children's expectation of privacy against the government's interest in conducting the Polinsky medical examinations.

Children removed from their parents' custody have a legitimate expectation of privacy in not being subjected to medical examinations without their parents' notice and consent.  *See, e.g., Yin v. California*, 95 F.3d 864, 871 (9th Cir. 1996) (Persons have "a legitimate expectation of privacy in being free from an unwanted medical examination, whether or not that examination entails any particularly intrusive procedures."); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995) (concluding that the collection of a public school student's urine sample, as well as its subsequent analysis, are invasions of societally-sanctioned expectations of privacy, but ultimately concluding that the search was reasonable).  While the County's custodial responsibility and authority over the children diminishes their privacy interests somewhat, *Parham*, 442 U.S. at 603, the children nonetheless maintain a legitimate expectation of privacy.

Importantly, the Polinsky medical examinations are significantly intrusive, as children are subjected to visual and

---

[13] In *Greene*, we concluded that the special needs exception does not apply to investigatory medical examinations of children removed from their parents' custody, *see* 588 F.3d at 1027, but the Supreme Court later vacated that portion of our opinion as moot, *see* 661 F.3d 1201 (9th Cir. 2011).

tactile inspections of their external genitalia, hymen, and rectum, as well as potentially painful tuberculosis and blood tests. *See Dubbs*, 336 F.3d at 1207. Children are forced to undress and are inspected, by strangers, in their most intimate, private areas. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 604 (1989) (urination is "an excretory function traditionally shielded by great privacy."). N.G.P.M.'s description of the examination to Melissa indicates that even at six years old, she knew that the examination had exposed something private. The County's argument that the examinations are "minimally intrusive" because they are "adjusted to the children's comfort level," ignores that the County routinely subjects children to these objectively intimate and potentially upsetting procedures.[14] And while the County argues that the test results "were used only for health-related rather than law enforcement purposes," the dual purposes of the search necessarily mean that the examinations could result in the disclosure of information to law enforcement, which would further intrude on the children's privacy. *Cf. Earls*, 536 U.S. at 833 (reasoning that because test results were kept in confidential files released to school personnel only on a "need to know"

---

[14] The County's comparison of the Polinsky medical examination to the urinary testing in *Earls* is not persuasive. In *Earls*, high school students who had voluntarily joined non-athletic extracurricular activities were subjected to urinary testing, which involved the student giving a urinary sample in the privacy of a bathroom stall. *Earls*, 536 U.S. at 832. Here, children who have been involuntarily removed from their parents are subjected to visual and tactile inspections of their genitals and rectum, in addition to other potentially upsetting procedures. The Polinsky medical examinations, in context, are far more privacy-invasive than the testing in *Earls*.

basis, this diminished the potential privacy invasion); *Vernonia*, 515 U.S. at 658 (same).

While the County's concern for the health of children in its custody is important, it has not demonstrated that the "nature and immediacy" of its interest outweighs the children's privacy interests. *See Earls*, 536 U.S. at 834. When a child is examined, he or she has already been admitted to Polinsky and been examined for emergency medical needs and contagious diseases.[15] While the initial assessment clearly serves to treat children's immediate needs and address potential dangers to other children at Polinsky, it is less evident how the search at issue does so. *Cf. Mueller*, 700 F.3d at 1187. And the County provides no other interest beyond the health of the child that would make the need to conduct the search more immediate such that providing notice and obtaining consent would impede the provision of necessary medical services.

Nor has the County demonstrated that compliance with the Fourth Amendment, i.e., providing parental notice and obtaining consent or judicial authorization, would be "impracticable." *See Earls*, 536 U.S. at 829. To the contrary, the County's current policy is to obtain parental consent and provide advance notice to the parents so that they can be present at the examination. The County's involvement with the juvenile court system throughout the dependency process provides it with ready access to request a warrant from the juvenile court if necessary. And as recognized by the AAP, the Polinsky medical examination

---

**[15]** Again, the Manns do not contest that the County may perform the initial medical assessments without parental notice or consent, as those assessments involve only a cursory observation for satisfactory vital signs and the absence of lice or fever.

may even benefit from the involvement of the parents, who can identify vaccines, medications, allergies, and chronic diseases that the child may not be able to communicate on her own.  There is no reason to think that parental notice and consent is "impracticable" in this context.

The Mann children's experience underscores our conclusion.  Here, the County removed the children from the family home, and could have sought Mark and Melissa's consent at that time.  When the children were subjected to the Polinsky medical examination the next day, Mark and Melissa were present in court, at which time the County also could have sought their consent.  And there was no suspicion that the Mann children had been sexually abused or needed immediate medical attention such that performing the search was necessary prior to providing Mark and Melissa notice and obtaining their consent.

Should exigent circumstances, i.e., medical emergency or the fear of evidence dissipating, necessitate an earlier examination, the County may perform the examination without notifying the parent and obtaining consent.  But in general, the County has provided us no compelling reason why it cannot wait to conduct the Polinsky medical examinations until it has at least attempted to notify the parents and obtain consent.  *See Dubbs*, 336 F.3d at 1214–15 ("While it is certainly true that a properly conducted physical examination is 'an effective means of identifying physical and developmental impediments in children,' this supplies no justification for proceeding without parental notice and consent." (citation omitted)).

Because the County's interest in protecting children's health does not outweigh the significant intrusion into the children's somewhat diminished expectation of privacy, the County's policy of subjecting children to the Polinsky

medical examinations without parental notice and consent is unreasonable. Thus, we conclude that the County violated the Mann children's Fourth Amendment rights by failing to obtain a warrant or to provide these constitutional safeguards before subjecting the children to these invasive medical examinations.

## III.

The County's continued failure to provide parental notice and obtain consent for the Polinsky medical examinations has harmed families in Southern California for too long. Here, the County subjected the Mann children to invasive medical examinations unbeknownst to their parents, who were meanwhile trying to cooperate with the County's investigation. The Manns were deprived of their right to raise their children without undue interference from the government, the right to make medical decisions for their children, and the right to privacy in their family life. The Mann children were subjected to invasive, potentially traumatizing procedures absent constitutionally required safeguards. Although we must balance these fundamental rights against the state's interest, we conclude that the County is constitutionally required to provide parental notice and obtain parental consent or judicial authorization for the protection of parents' and children's rights alike.

**AFFIRMED IN PART and REVERSED IN PART.**